August 31, 2011

**Vivian VUMBACA, individually and on behalf of all others similarly situated, Plaintiff,**

v.

**TERMINAL ONE GROUP ASSOCIATION L.P., Defendant.**

**No. 11–CV–5535.**

United States District Court, E.D. New York.

April 20, 2012.

348

Thatcher A. Stone, New York, NY, Timothy N. Mathews, Steven A. Schwartz Chimicles & Tikellis, Haverford, PA, for the plaintiff.

Michael J. Holland, Marissa Nicole Lefland, Condon & Forsyth, LLP, New York, NY, for the defendant.

**MEMORANDUM, ORDER, & JUDGMENT**

JACK B. WEINSTEIN, Senior District Judge:

I. Introduction and Synopsis ............................................... 351

II. Facts ................................................................. 353
 A. Parties .......................................................... 353
 B. Terminal's Contractual Rights and Responsibilities ............... 354
 C. Terminal's Snow Plan ............................................. 354
 D. Snowstorm of December 2010 ....................................... 355
 E. Understaffing .................................................... 355
 F. Failure to Warn .................................................. 356
 G. Trapped Passengers ............................................... 357
 H. Conditions at Other Facilities .................................. 358
 1. International at JFK ......................................... 358
 2. Domestic at JFK ............................................. 358
 3. Nearby Airports ............................................. 359
 I. Effect of Incident on Plaintiff ................................. 359

III. Jurisdiction ......................................................... 359

IV. Summary Judgment Standard ............................................ 360

V. Choice of Law ........................................................ 360

VI. International Law ..................................................... 361
 A. Montreal Convention Preempts Claims Against Carriers and Their
 Agents ........................................................... 361
 B. Terminal is an Agent of Air Carriers ............................ 363
 C. Articles 17 and 19 Do Not Permit Claims for Emotional and Dignitary
 Harm ............................................................. 364
 1. Article 17 .................................................. 364
 2. Article 19 .................................................. 366
 D. No Recovery Under Convention .................................... 368

VII. New York State Law ................................................... 368
 A. Negligence ....................................................... 368
 1. Standard .................................................... 369
 2. Terminal Had a Duty to Plaintiff ............................ 369
 3. Liability for Emotional Distress ............................ 372
 B. Intentional Infliction of Emotional Distress .................... 377
 C. False Imprisonment .............................................. 378
 D. No Recovery Under New York Law .................................. 381

VIII. Conclusion .......................................................... 381

## I. Introduction and Synopsis

Plaintiff alleges that she was kept locked in an aircraft on the ground without food, water, or adequate sanitary facilities for seven hours, suffering mental distress. Hers is a most appealing case. Yet the law can only give her sympathy, not mone-

tary compensation. An international treaty and New York law bar recovery.

From December 26th to 27th, 2010, during the height of the holiday travel season, the New York metropolitan area was—somewhat unexpectedly—blanketed with over a foot of snow. John F. Kennedy International Airport (JFK) was closed to air traffic for the worst of the storm. When it reopened, there were continuing problems. Passengers on arriving flights were forced to endure substantial waits after landing before they were able to disembark. Difficulties appear to have been particularly severe at terminals serving international flights. The events sparked a federal investigation and new regulations that forbid foreign air carriers from permitting international flights to remain on the tarmac at a United States airport for more than four hours without allowing passengers to deplane. *See* Enhancing Airline Passenger Protections, 76 Fed.Reg. 23110, 23110 (Apr. 25, 2011) (extending existing regulations, which applied to domestic carriers, to foreign carriers).

Plaintiff Vivian Vumbaca was one of the stranded passengers. Trapped for most of the night aboard an Alitalia flight from Rome that had arrived at Terminal One, she was forced to endure, as she put it, "cramped, uncomfortable, malodorous conditions, without food, water and sanitation" for nearly seven hours. Pl.'s Mem. of Points and Authorities in Opp. to Def.'s Mot. for Summ. J. 1, Doc. Entry 22, Jan. 31, 2012 ("Pl.'s Summ. J. Mem."). This resulted, according to her, in "severe emotional distress." Compl. ¶ 19, Doc. Entry 1, Nov. 10, 2011 ("Compl.").

She sued Terminal One Group Association, L.P. (TOGA), which operates Terminal One, and seeks to represent similarly situated passengers claiming emotional harms resulting from negligence, false imprisonment, and intentional infliction of emotional distress. *See generally* Compl. She initially pled simple state law causes of action for negligence, false imprisonment, intentional infliction of emotional distress, and prima facie tort (presumably under New York law). She now concedes that the prima facie tort claim should be dismissed. Pl.'s Summ. J. Mem. 22.

Defendant moves to dismiss all of plaintiffs claims on the ground that plaintiff failed to state a claim under New York law. Def.'s Mot. to Dismiss for Failure to State a Claim, Doc. Entry 12, Dec. 9, 2011.

At the court's direction, the motion directed at the pleadings was converted to one for summary judgment. Order, Doc. Entry 14, Dec. 20, 2011. Briefing was also ordered on the applicability and effect of the Montreal Convention, an international treaty governing the liability of air carriers and their agents. Order, Doc. Entry 33, Feb. 16, 2011; *see* The Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999, *reprinted in* S. Treaty Doc. No. 106–45, 1999 WL 33292734 (2000) ("Montreal Convention"). Following a hearing, ordered were supplemental discovery and briefing on the issue of what, if any, harms plaintiff suffered. *See* Order, Doc. Entry. 41, Feb. 24, 2012.

Plaintiff initially only claimed tort damages under New York State law for "hunger, thirst, foul air, and the absence of sanitary facilities." Compl. ¶ 19. After the court pointed out legal difficulties in her original claim due to her lack of physical injury, she sought, in effect, to amend her complaint through her brief. She now claims that the Montreal Convention permits her to recover for the harms initially alleged. She also says she is "entitled to recover, under the ... Montreal Convention, damages for: delay and inconvenience including economic losses ... [and] out-of-pocket losses for delay of baggage."

Pl.'s Mem. of L. Addressing Questions Raised by the Court As to Compensable Injury 1, Doc. Entry 45, Apr. 2, 2012 ("Pl.'s Injury Mem."). She has not requested leave to add these new claims for delay of baggage and economic loss in an amended complaint.

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, only "a short and plain statement of [the facts of] the claim showing that the pleader is entitled to relief is required, not legal analysis." Plaintiff's original statement of the facts in her complaint supports her legal theory and claim for emotional and dignitary harms under the Convention. This new theory of relief will be considered.

■ There is no reason to permit plaintiff to go forward on her new claims for economic loss due to delay of her baggage. The many factual questions of when her baggage was offloaded, what caused its delay, when it was made available to her, and why and to what extent she suffered economic loss due to baggage delay, will require additional costly discovery. Any economic costs due to delays in baggage delivery do not warrant the extensive cost of extended litigation, since any recovery is likely to be de minimis.

■ As to the claim for economic loss due to delay of the person, only a taxi fare of $55 is claimed. See Part II(I), infra. No factual claim under Rule 8 was made in the complaint for economic loss due to delay. The large cost of permitting discovery at this late date on economic loss is unwarranted, particularly since so small a sum is involved.

An amendment of the complaint will not be authorized at this late stage in the proceeding. The court will only consider the claims relating to the harms initially raised by the complaint and motion for summary judgment—those for injury to the person.

Analysis of the applicable legal theories may be helpful to the reader. Two bodies of law need to be considered. Since defendant TOGA is an agent of the air carriers it serves, plaintiff's state tort claims are preempted by the Montreal Convention, and she can only recover to the extent permitted by it. See Part VI(A), infra. Plaintiff argues that the Convention would permit her to recover under either Article 17 or Article 19. Pl.'s Injury Mem. 1. Article 17 governs injuries to the person that occur on aircraft or while embarking or disembarking—as occurred in this case. See Part VI(C), infra. While applicable, Article 17 does not permit recovery because plaintiff has not suffered a "bodily injury," as required by that provision. Id. Similarly, Article 19, which covers damages caused by delay, only permits recovery of economic loss, not the physical harms sought under plaintiff's complaint. See Part VI(B), infra.

Were the terminal to be found not to be an agent of the air carrier, then New York common law, rather than the Convention, would apply. Plaintiff's intentional tort claims under New York law are without merit. See Parts VII(B)-(C), infra. Nor can plaintiff recover under a theory of negligence, since New York law generally denies recovery for emotional distress in the absence of an accompanying or consequential physical injury—which is lacking here. See Part VII(A), infra.

Because plaintiff's claims fail under either body of applicable law, defendant's motion for summary judgment is granted.

## II. Facts

### A. Parties

Plaintiff is a legal permanent resident of the United States residing in New York. Compl. ¶ 10. She sues TOGA, a New York

corporation that leases, finances, and operates Terminal One, an eleven-gate international passenger terminal, at JFK. Pl.'s Rule 56.1 Statement Ex. 1 (Contract Between TOGA and the Port Authority of New York and New Jersey), Doc. Entry 23, Jan. 31, 2012 ("TOGA Lease"). Its general partner is Terminal One Management, Inc. and its limited partners are four airlines: Air France, Japan Air Lines, Korean Air, and Lufthansa. *Id.* Alitalia, which is not a party to the present action, leases space in the terminal. *See generally* Pl's Rule 56.1 Statement Ex. 5 (Alitalia Lease), Doc. Entry 23, Jan. 31, 2012 ("Alitalita Lease"). More than one million people enter the United States through Terminal One each year. PL's Rule 56.1 Statement Ex. 3, at 50:8–13 (Dep. of Robert H. Junge, Port Authority Manager of Operations at JFK Airport), Doc. Entry 23, Jan. 31, 2012 ("Junge Dep.").

### B. Terminal's Contractual Rights and Responsibilities

Under the terms of its lease agreement with the owner and operator of JFK, the Port Authority of New York and New Jersey (Port Authority), TOGA "agree[d] to provide service at the premises for the benefit of the traveling public." TOGA Lease at 188. It assumed "the entire responsibility for . . . all repair, . . . and maintenance whatsoever in the premises, whether such repair . . . or maintenance be ordinary or extraordinary, [including] . . . *remov[ing] all snow and ice* and perform[ing] all other activities and functions necessary or proper to make the premises available for use." *Id.* at 74 (emphasis added). TOGA further agreed to "furnish all necessary or proper personnel, . . . and facilities [and] . . . furnish such services promptly, efficiently, and adequately to meet the demands therefor." *Id.* at 62.

TOGA had sole responsibility for managing the gates by which passengers moved

between the terminal and an airplane. Junge Dep. 118:24–119:2. This included the duty and discretion to select a ground handling provider to move planes to and from the gates. Alitalia Lease at TOGA 000096. A four-person crew is typically required: a "pushback" operator who moves the aircraft away from the gate; two "wing walkers" who ensure adequate clearance; and a supervisor. Pl.'s Rule 56.1 Statement Ex. 6, at 192:5–19 (Dep. of Neil Samaroo), Doc. Entry 23, Jan. 31, 2012 ("Samaroo Dep."). TOGA subcontracted with Aircraft Service International Group (ASIG) for ground handling. Pl.'s Rule 56.1 Statement Ex. 7 (Contract Between TOGA and ASIG), Doc. Entry 23, Jan. 31, 2012 ("ASIG Contract").

Pursuant to its contract with TOGA, Alitalia agreed to "indemnify and hold harmless" TOGA "from . . . all claims of third parties or otherwise, including claims for death, personal injuries or property damages arising out of . . . the use or occupancy of the Terminal One Facilities." Alitalia Lease at TOGA_000060. Alitalia also agreed to:

> indemnify, defend and hold harmless [ASIG] from and against all claims, losses, liability, damages, causes of action and judgments, including all costs and expenses incident thereto . . . on account of . . . injury to or death of any person, arising out of the negligence or willful misconduct of [ASIG], its employees, officers, directors, or partners in furnishing services pursuant to this agreement.

*Id.* at TOGA_000096.

### C. Terminal's Snow Plan

TOGA has a written snow plan. Pl.'s Rule 56.1 Statement Ex. 8 (Terminal One Snow Plan), Doc. Entry 23, Jan. 31, 2012 ("TOGA Snow Plan"). It allocates responsibility and outlines procedures for clear-

ing snow from terminal areas. *Id.* The plan notes:

> It may be necessary to coordinate with carrier maintenance representatives to move aircraft back from the gates to facilitate plowing. ASIG should be aware of this possibility and have qualified push-back personnel available. Close coordination is essential for safe operation.

*Id.* at TOGA_000012.

Pursuant to the snow plan, some of TOGA's contractors, such as Airway Cleaners, Inc. (ACI), are required to "freeze"—i.e., extend—their employees' shifts in the event of a snow operation. *Id.* at TOGA_000016 (stating that employees of ACI who are on duty during a snow operation "will have their shift 'frozen' until further notice to supplement incoming shifts"); *see also* Samaroo Dep. 146:21–147:15. ASIG, which provided ground handling, was not required to "freeze" its staffing during a snow event. *See* Samaroo Dep. 147:16–19; *see generally* ASIG Contract.

### D. Snowstorm of December 2010

On December 23, 2010, the Port Authority, recognizing the severity of the oncoming storm and its potential impact on airport operations, declared a snow emergency. Junge Dep. 107:19–20. To prepare, the Port Authority brought in extra employees and placed them in an airport hotel to ensure adequate staffing. *Id.* 107:19–108:13.

On December 25th, TOGA advised air carriers which used Terminal One that "all service providers are prepared and ready with manpower and equipment." Pl.'s Rule 56.1 Statement Ex. 9, at TOGA_000196 (Summary of Events Created by Neil Samaroo), Doc. Entry 23, Jan. 31, 2012 ("Samaroo Summ.").

Snow began falling at 10:18 a.m. on December 26, 2010. Pl.'s Rule 56.1 Statement Ex. 4, at 1 (JFK Airport Operations Log), Doc. Entry 23, Jan. 31, 2012 ("JFK Operations Log"). The airport was closed at 7:17 p.m. that evening. *Id.* at 3.

According to the defendant's "Daily Shift Report," "all of [TOGA's] carriers were asked to either consolidate flights, delay, or cancel altogether" that day. PL's Rule 56.1 Statement Ex. 18 (Daily Shift Report), Doc. Entry 23, Jan. 31, 2012. Nine incoming international flights to Terminal One were cancelled by airlines on December 26, 2010. JFK Operations Log at 3. Sixteen flights bound for Terminal One were cancelled by airlines on the 27th. Samaroo Summ. at TOGA_000201.

The storm ended on December 27th at approximately 8:00 a.m. JFK Operations Log at 6. Over fifteen inches of snow had fallen. *Id.* The airport reopened at 6:07 p.m. that day. *Id.* At that time, all the gates at Terminal One were still occupied with aircraft that had been prepared for departure when the airport closed the previous night. Samaroo Dep. 75:19–76:22.

### E. Understaffing

ASIG had sufficient staff at Terminal One on the morning shift of December 26th. Samaroo Dep. 81:3–20. While some employees stayed past the end of their shift, most went home. *Id.* Staff from subsequent shifts did not arrive. As early as 1:00 p.m. on December 27th, 80% of ASIG's scheduled employees were absent. Pl.'s Rule 56.1 Statement Ex. 12 (Email from Ed Paquette to TOGA's Officers), Doc. Entry 23, Jan. 31, 2012. By December 28th, ASIG was operating with an 85–90% staffing deficit. PL's Rule 56.1 Statement Ex. 10 (Email from Ed Paquette to TOGA's Officers), Doc. Entry 23, Jan. 31, 2012 ("Dec. 28 Email from Ed Paquette"). Normally one hundred ASIG ground handlers were required to operate Terminal

One, but only thirteen were present. Samaroo Dep. 80:7–81:2.

Without sufficient ground staff, both departing and arriving aircraft experienced delays in moving to and from the gates. Samaroo Summ. at TOGA_000210. Aircraft blocked gates from between twenty-four hours and three days. *Id.* at TOGA_000207–09. And planes could not be moved to fully clear the snow on the tarmac. *Id.* at TOGA_000210; *see also* Samaroo Dep. 81:23–83:12 ("[T]he personnel that were on duty were not sufficient enough to even accommodate us moving an aircraft off the gate in order for snow removal to be done.").

While TOGA had mobile stairs and buses available to help disembark aircraft passengers at a remote location away from the terminal, it was unable to use this equipment because of uncleared snow, ramp conditions, and a lack of staff to operate equipment. Samaroo Dep. 137:16–140:3.

ACI, which had frozen its employee's shifts, was adequately staffed during this period. Dec. 28 Email from Ed Paquette. So were other subcontractors that serviced Terminal One, including companies responsible for cleaning planes and for operating restaurants in the terminal. *Id.* Like ASIG staff, many of these employees relied on public transportation to get to Terminal One. *Id.*

Another ground handling company that serviced different terminals, Swissport, took affirmative steps to ensure adequate staffing during and following the snow emergency. It arranged accessible meeting places and sent vehicles to neighborhoods where employees lived to transport them to the airport. Junge Dep. 203:15–205:19. But defendant notes that, at Terminal Four, Swissport operated with only 10% of normal personnel. *Id.* at 189:5–189:13, 205:13 –205:19. Defendant also

points to evidence that the entire airport was staffed at approximately 10% of its regular needs, and that similar staffing problems were experienced at Terminals One, Four, Seven, and Eight. *Id.* at 94:11–96:6.

## F. Failure to Warn

In the event of adverse conditions at the terminal, TOGA's practice is to contact the local station managers of the airlines it services rather than to contact the headquarters of those airlines. Samaroo Dep. 49:23–25. Local station managers do not have the authority to cancel flights that begin abroad. Junge Dep. 190:7–191:5; Samaroo Dep. 125:21–126:6; 162:13–17; 174:2–14.

As events developed on December 27th–28th, phone calls were made by TOGA to the local station managers "generally pertaining to the events that took place" and "advis[ing] the carriers [of] the conditions that the terminal was in, the progress of the snow removal process, the staffing situation with the ground handler that we were having and the fact that there w[ere] no gates available for inbound flights, and to cancel flights." Samaroo Dep. 206:20–207:21. Plaintiff claims that Samaroo's testimony that TOGA told Alitalia to cancel its flights is contradicted by other documentary evidence and is not credible. Pl.'s Summ. J. Mem. 12–13 ("[T]he written summary of events does not reflect [that these calls were made], nor does it reflect *any* calls to Alitalia. . . . [T]he summary shows that only two carriers operated flights after being advised not to do so. . . . It makes no sense that his summary would have specifically mentioned those two carriers if all the carriers who sent flights had ignored TOGA's instructions."). There are no written records of these claimed cancellation calls. Although daily shift reports are regularly used by TOGA, Samaroo

Dep. 170:11–171:2, none were created for December 27th–28th, *id.* at 172:18 –173:18.

On December 28th at 2:50 a.m., TOGA Manager on Duty, Miguel Arvelo, emailed Alitalia's local manager, Gaetano Messina:

> I know during our previous conversation you agreed to delay flights if necessary. At this time *I do not think adding an additional flight to tomorrow's operation would be wise. I must insist that you consider delaying and/or canceling at least one of these flights* [AZ608; AZ604; AZ610; AZ6608]. Due to cancelled and delayed flights there may not be enough gates to handle even regularly scheduled flights.

Pl.'s Rule 56.1 Statement Ex. 15 (Email from Miguel Arvelo to Gaetano Messina), Doc. Entry 23, Jan. 31, 2012 (emphasis added). At 9:00 a.m. that same morning—before plaintiff's flight left Rome, Italy—Ed Paquette, Executive Director of Terminal One Management, Inc., emailed TOGA's officers:

> Here we are day three and ASIG is still having staffing issues. . . . I am philosophically opposed to paying for a service I did not receive, particularly on this grand of a scale I am seriously contemplating withholding payment for the last three days, not partial payment but full payment.

Dec. 28 Email from Ed Paquette.

On December 28th, three Alitalia flights were delayed in setting off for New York for between one and three hours; none were cancelled. Pl.'s Rule 56.1 Statement Ex. 16 (Historical Schedule for 12/28/2010), Doc. Entry 23, Jan. 31, 2012. The departure of plaintiff's flight from Italy was delayed for one hour. *Id.*

One or more airlines other than Alitalia were apparently "guaranteed" a gate at Terminal One prior to their departure from abroad, but these planes were never-

theless forced to wait for hours on the tarmac before being permitted to access a gate and offload passengers. PL's Rule 56.1 Statement Ex. 19 (JFK Post–Blizzard Foreign Carrier Tarmac Delays: Synopsis of Incidents for FAA Feb. 8, 2011), Doc. Entry 23, Jan. 31, 2012 (FAA Synopsis).

Both before, during, and after the storm, TOGA never communicated directly with the headquarters of the foreign airlines it services regarding conditions at the terminal, although it could have done do. Samaroo Dep. 187:11–188:5.

### G. Trapped Passengers

Because of the inadequate ground handling staff, planes arriving at Terminal One were unable to access gates in a timely manner, whether because those gates were blocked by empty aircraft or because the approach was blocked by snow. Nor was there any other feasible means of disembarking those passengers. *See* Part 11(D), *supra.*

Between the afternoon of December 28th and the morning of December 29th, there were at least sixteen flights arriving at Terminal One with tarmac delays in excess of four hours. Samaroo Summ. at 11.

Without any means of egress from the aircraft, passengers were effectively trapped. Toileting conditions became unsanitary. Compl. ¶ 7. There was limited food and water. *Id.; see also* Aff. of Michael J. Holland Ex. B (Dep. of Vivian Vumbaca 19:15–20:5; 21:3–25) ("Vumbaca Dep.").

Plaintiff was one of the stranded passengers. When her flight landed on December 28th at 7:22 p.m., Pl.'s Rule 56.1 Statement Ex. 16 (Historical Schedule for 12/28/2010), Doc. Entry 23, Jan. 31, 2012, the aircraft could not reach the taxiways, nor could emergency equipment reach the aircraft. Compl. ¶¶ 15–16. She was

forced to remain aboard the plane for nearly seven hours. Samaroo Summ. at 11.

### H. Conditions at Other Facilities

#### 1. International at JFK

It is unclear whether passengers arriving at other international terminals experienced the same lengthy delays experienced by plaintiff and her fellow passengers at Terminal One. At Terminal Eight, for example, American Airlines told Finn Air that the terminal was closed and not to send any flights until further notice. Junge Dep. 195:15–197:16. There were no extended tarmac delays at that terminal. Junge Dep. 172:7–177:4. Similarly, on December 28, 2010 at 10:00 a.m., Terminal Four sent a "blast fax to all of the airlines [it serviced] . . . that they are not accepting any arrivals until [6:00 p.m. local time]." JFK Operations Log at 12. Flights arriving at Terminal Four experienced tarmac delays of four and a half hours or less. *See* Pl.'s Rule 56.1 Statement Ex. 13 (Tarmac Times), Doc. Entry 23, Jan. 31, 2012; Junge Dep. 172:7–177:14.

Defendant points to several instances in which passengers on Cathay Pacific flights—a Terminal Seven carrier—endured tarmac delays of four and a half to nearly eleven hours. FAA Synopsis at 2. Similarly, at Terminal Four, five flights experienced delays of over three and a half hours. *Id.*

International flights throughout JFK may have experienced problems similar to those experienced at Terminal One because of difficulties in interfacing with foreign carriers.

Terminals dominated by foreign international carriers (T1, T4, T7) definitely had more of a problem managing gate throughout than the ones managed by U.S. carriers (T2/3, T5, T8) due to the greater complexity of numerous small carriers with oversea decision making on schedule. . . . [Terminals a]dvised they have limited control over airline decision to launch international arrivals despite knowing JFK's field and terminal conditions. . . . [They a]dvised that some international carrier prefer to have arrival come into JFK with a prolonged wait rather than divert. Some international carriers launch arrivals before they know the details of the opening airport.

Aff. of Michael J. Holland Ex. 22 (Feedback from the January 4, 2011 Meeting with the Terminal Operators & Federal Agencies), Doc. Entry 26, Feb. 7, 2012; *see also* Junge Dep. 191:5–12 ("[T]he biggest problem I can synopsize out of this whole thing is the individual carriers, business models took precedence over what was really available, able to happen, be accommodated at the airport.").

#### 2. Domestic at JFK

Conditions at terminals serving domestic flights were not as severe as those at Terminal One. There were at most four domestic flights with tarmac delays in excess of three hours between December 26th and 29th. Junge Dep. 164:11–16; 166:14–24; *see also* Pl.'s Rule 56.1 Statement Ex. 20 (Bureau of Transportation Statistics), Doc. Entry 23, Jan. 31, 2012 (showing no domestic flight delays of three hours or more at JFK during the month of December 2010).

Plaintiff alleges that the international terminal was not cleared of snow, and international passengers were subjected to adverse treatment, because airlines were subject to fines if passengers on domestic flights were kept on the tarmac for more than three hours. Compl. ¶ 5; *see also* Enhancing Airline Passenger Protections, 73 Fed.Reg. 74,586 (proposed Dec. 8, 2008) (to be codified at 14 C.F.R. pts. 234, 259,

399). At the time, the same fines did not apply when passengers on international flights were subject to the same difficult conditions. Compl. ¶ 5.

Defendant points to testimony that domestic carriers were also less severely affected than international carriers because the former are able to cancel or divert flights to alternative airports more rapidly. Junge Dep. 262:2–262:2.

### 3. Nearby Airports

Although other airports in the region—including Newark, LaGuardia, Boston, Philadelphia, and Bradley—were similarly affected by the storm, there were no tarmac delays in excess of three hours at any of them. Junge Dep. 167:1–171:21.

### I. Effect on Plaintiff

Following an initial hearing held on February 23, 2012, at the court's suggestion, the parties conducted additional discovery as to the injuries plaintiff suffered due to her entrapment aboard the aircraft. At her deposition, plaintiff testified that she suffered headache, nausea, and exhaustion as a result of the incident:

> The injury is dehydration, headache. And the air was unbelievable. And there was no water. The only liquid that you could have was juice. And there was no food apart [from] snacks. And there was a smell of the bathroom that was just in my back, because I was seated in front of the bathroom. It was horrible. And I'm sure each one of the passengers will say the same thing.
>
> . . .
>
> I didn't get any bruises, but I think sometimes it can be worse than that. You know, like waiting forever, with no drinks, and there was no way you could get out of the airplane, and nobody would tell you how long you would be there. And the bathroom was almost unusable. And there was no fresh air

whatsoever. So I don't know. The problem wasn't a bruise, you know. The problem was that we didn't have water. We didn't have like acceptable food, and we were there waiting forever, sitting in a very confined area. And that's what it was.

> . . .
>
> I was nauseous for the following three days. I had stomachache, I was very tired.

Vumbaca Dep. 19:15–20:5; 21:3–25; *see also* Pl.'s Injury Mem. Ex. A (Decl. of Vivian Vumbaca ¶ 1), Doc. Entry 45, Apr. 2, 2012 ("Vumbaca Decl.") ("I suffered physical injury, including dehydration, headache, and nausea. I was also physically disgusted by being forced to breathe stale, foul air. I also experienced hunger and thirst, as well as physical discomfort as a result of being confined to a small space, with little room to move, and inadequate restroom facilities. As a result of these physical conditions, I was physically exhausted for several days, which interfered with my normal activities.").

Plaintiff also claims that she suffered out-of-pocket and other monetary damages as a result of the tarmac delay. She states that, had her plane disembarked at 6:30 p.m. as scheduled, she would have either taken the train home or had a friend pick her up at the airport. Vumbaca Decl. ¶ 3. Because she was not able to leave the airport until after 2:30 a.m., she instead paid approximately $55 for a cab. *Id.* Since her baggage was not immediately available when she disembarked, she claims she was forced to purchase replacements of personal items, including a toothbrush and toothpaste, costing $50. *Id.* ¶ 4. She also purchased Advil to treat her headache at a cost of $15. *Id.* ¶ 5.

### III. Jurisdiction

Since plaintiff's complaint alleged only New York State tort claims, jurisdiction

was initially founded on diversity. Plaintiff framed the case as a putative class action on behalf of "[a]ll passengers on international flights that arrived at JFK Terminal One between December 26 and December 31, 2010, who were not disembarked until three hours or more after landing." Compl. ¶ 21. The likely diversity between the defendant and at least one potential class plaintiff provides this court with subject matter jurisdiction over the claims. *See* 28 U.S.C. § 1332(d)(2) ("The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which ... (A) any member of a class of plaintiffs is a citizen of a State different from any defendant; (B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or (C) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state."). Were the class certified, the total damages for the thousands of passengers who might fit within the class could exceed $ 5,000,000.

Now that plaintiff also claims under the Montreal Convention, there is federal question jurisdiction. 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."); Montreal Convention art. 33 ("1. An action for damages must be brought, at the option of the plaintiff, in the territory of one of the States Parties, either before the court of the domicile of the carrier or of its principal place of business, or where it has a place of business through which the contract has been made or *before the court at the place of destination.* 2. *In respect of damage resulting from the* death *or* injury *of a passenger, an action may be brought be-* *fore one of the courts mentioned in paragraph 1 of this Article, or in the territory of a State Party in which at the time of the accident the passenger has his or her principal and permanent residence and to or from which the carrier operates services for the carriage of passengers by air,* either on its own aircraft or on another carrier's aircraft pursuant to a commercial agreement, and in which that carrier conducts its business of carriage of passengers by air from premises leased or owned by the carrier itself or by another carrier with which it has a commercial agreement." (emphasis added)).

## IV. Summary Judgment Standard

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 5 (2d Cir.1999). In determining whether the party seeking summary judgment has met its burden, "the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir.2010).

## V. Choice of Law

■ A federal court sitting in diversity applies the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Fieger v. Pitney Bowes Credit Corp.,* 251 F.3d 386, 393 (2d Cir.2001). In New York, the "first step in any case presenting a ... choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *In re Allstate Ins.*

*Co.*, 81 N.Y.2d 219, 597 N.Y.S.2d 904, 613 N.E.2d 936, 938 (1993). Assuming that an actual conflict exists between the laws of jurisdictions with interests in having their law applied to the case, the court is to apply interest analysis to determine which jurisdiction has the greatest interest in having its law applied to the dispute. *See, e.g., Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 620 N.Y.S.2d 310, 644 N.E.2d 1001, 1002 (1994). In applying interest analysis, two separate inquiries are required: (1) the determination of the significant contacts and their locations; and (2) the determination of whether the relevant law is conduct-regulating or loss-allocating. *See id.* "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Id.* (internal quotation marks omitted); *see, e.g., Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279, 285 (1963) (Fuld, J.).

■ To the extent there is any conflict issue, New York law applies. The instant case arises out of common law rules regulating conduct—i.e., the torts of negligence, false imprisonment, and intentional infliction of emotional distress. The plaintiff is a New York resident, and the defendant a limited liability partnership with its principle place of business in New York. The incident sued on occurred in New York. Neither party contests that New York cases are controlling; New York law therefore controls. *See Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 467 (2d Cir.1995) ("Because both parties agree that New York cases are controlling, we shall assume that New York law governs this diversity action.").

## VI. International Law

The Montreal Convention preempts state law claims against international air carriers or their agents. TOGA is an agent of the air carriers it serves, since the actions it took were in service of the carriers' contract of carriage—i.e., assisting them in completing its passengers' journey. Because TOGA is the air carrier's agent, plaintiff can only recover to the extent permitted by the Convention.

Plaintiff alleges that the Convention permits her to recover for "bodily and emotional injury" and "pain and suffering for emotional injury" under Article 17, as well as for inconvenience and false imprisonment under Article 19. *See* Pl.'s Mem. of L. Addressing the Warsaw and Montreal Conventions in Response to the Court's Request, Doc. Entry 39, Feb. 23, 2012; Pl.'s Injury Mem. 1. As pointed out below, these claims are without merit. Plaintiff cannot recover under Article 17, which only permits recovery for "bodily injuries" that occur on board aircraft, not the emotional harms she claims. Nor does Article 19 permit recovery for the non-economic harms claimed. As noted in Part I, while plaintiff now seeks to add claims for economic harm, these claims will not be considered because they are *de minimis* and were not sought in the complaint.

## A. Montreal Convention Preempts Claims Against Carriers and Their Agents

■ The Montreal Convention, an international treaty to which the United States is a party, establishes a uniform system of liability for international air carriers. *See generally* Montreal Convention; *see also Ehrlich v. American Airlines*, 360 F.3d 366, 370–71 (2d Cir.2004). It applies to "all international carriage of persons, baggage, or cargo performed by aircraft for reward." Montreal Convention art. 1. It is largely substantively unchanged from its predecessor treaty, the Warsaw Convention, and is construed using case law

interpreting that treaty. *See Ehrlich*, 360 F.3d at 399 ("[T]he new Montreal Convention's liability provision [does] not change or otherwise limit the existing [Warsaw Convention] jurisprudence."); *see also Paradis v. Ghana Airways Ltd.*, 348 F.Supp.2d 106, 111 (S.D.N.Y.2004), *aff'd* 194 Fed.Appx. 5 (2d Cir.2006).

The Convention's limitations on liability extend to agents of the carrier. The Convention provides that:

> If an action is brought against a servant or agent of the carrier arising out of damage to which the Convention relates, such servant or agent, if they prove that they acted within the scope of their employment, shall be entitled to avail themselves of the conditions and limits of liability which the carrier itself is entitled to invoke under this Convention.

Montreal Convention art. 30; *see also id.* art. 43 ("In relation to the carriage performed by the actual carrier, any servant or agent of that carrier or of the contracting carrier shall, if they prove that they acted within the scope of their employment, be entitled to avail themselves of the conditions and limits of liability which are applicable under this Convention to the carrier whose servant or agent they are, unless it is proved that they acted in a manner that prevents the limits of liability from being invoked in accordance with this Convention."). Although the explicit language extending coverage to agents was an addition to the Montreal Convention, courts interpreting its predecessor treaty had extended its conditions and limits of liability to the agents and servants of the air carrier. *See Reed v. Wiser*, 555 F.2d 1079, 1089–93 (2d Cir.1977) (applying Warsaw Convention's limitations to airline employees); *Waxman v. C.I.S. Mexicana De Aviacion, S.A. De C.V.*, 13 F.Supp.2d 508, 514 (S.D.N.Y.1998) (finding an aircraft cleaning service to be acting in furtherance of the airline's contract of carriage and therefore covered by the Warsaw Convention); *In re Air Disaster at Lockerbie, Scotland on Dec. 21, 1988*, 776 F.Supp. 710, 714 (E.D.N.Y.1991) (stating that the Warsaw Convention covers agents that "perform services in furtherance of the contract of carriage, and to those agents performing services within the scope of the Convention that the airline is otherwise required by law to perform"); *see also Lerakoli, Inc. v. Pan Am. World Airways, Inc.*, 783 F.2d 33, 36 (2d Cir.1986) (noting the "reasoning of this and other courts ... holding that the liability limitations for air carriers under the Warsaw Convention should be extended to employees and agents of such carriers").

■ If a party is not an agent of an air carrier, then the Convention has no effect on its liability under local law. Montreal Convention art. 37 ("Nothing in this Convention shall prejudice the question whether a person liable for damage in accordance with its provisions has a right of recourse against any other person."); *see also Ugaz v. American Airlines, Inc.*, 576 F.Supp.2d 1354, 1364 (S.D.Fla.2008) ("As to Defendant [terminal operator] Miami–Dade County, the Montreal Convention only governs carriers. Thus, because the County is not a carrier, it cannot be held liable where an action falls within the Convention's purview.").

The remedy the Convention provides against international air carriers and their agents is exclusive. When operative, it preempts all state law claims for damages against air carriers and their agents. Montreal Convention art. 29 ("In the carriage of passengers, baggage and cargo, *any action for damages, however founded,* whether under this Convention or in contract or in tort or otherwise, *can only be brought subject to the conditions and such limits of liability as are set out in this*

*Convention* without prejudice to the question as to who are the persons who have the right to bring suit and what are their respective rights." (emphasis added)); *Shah v. Pan American World Services, Inc.,* 148 F.3d 84, 97–98 (2d Cir.1998) ("[A]U state law claims that fall within the scope of the Convention are preempted."); *Singh v. North American Airlines,* 426 F.Supp.2d 38, 44–45 (E.D.N.Y.2006) (holding that the Convention completely preempts those claims that fall within its scope); *see also El Al Israel Airlines v. Tseng,* 525 U.S. 155, 176, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999) ("[T]he Warsaw Convention precludes a passenger from maintaining an action for personal injury damages under local law when her claim does not satisfy the conditions for liability under the Convention."); *King v. American Airlines, Inc.,* 284 F.3d 352, 361 (2d Cir.2002) (discussing the Convention's expansive preemptive effect). "A passenger whose injuries fall within the scope of the Warsaw Convention is either entitled to recovery under the Convention or not at all." *Magan v. Lufthansa German Airlines,* 339 F.3d 158, 161 (2d Cir.2003).

## B. Terminal is an Agent of Air Carriers

The Convention does not define "agent." The Supreme Court has provided no guidance.

The Court of Appeals for the Second Circuit has held that the airline employees are agents covered by the Convention. *Reed,* 555 F.2d at 1089–93. In so holding, the *Reed* panel concluded that the Convention's "basic principle" required that air carriers be "protected from having to pay out more than a fixed and definite sum for passenger injuries sustained in international air disasters." *Id.* at 1089. Accordingly:

[t]o permit a suit for an unlimited amount of damages against a carrier's

employees for personal injuries to a passenger would unquestionably undermine this purpose . . ., since it would permit plaintiffs to recover from the carrier through its employees damages in excess of the Convention's limits.

*Id.* The court did not rule on whether other entities might also be considered agents, or establish a test by which it could be determined when an entity is an agent covered by the Convention.

Lower courts have held that an entity is an agent of an air carrier if it "perform[s] services in furtherance of the contract of carriage, and . . . services within the scope of the Convention that the airline is otherwise required by law to perform." *In re Air Disaster at Lockerbie, Scotland on Dec. 21, 1988,* 776 F.Supp. at 714. They have found that the Convention's limits on liability apply to subcontractors which provide airport security, *id.* at 714; clean planes, *Waxman,* 13 F.Supp.2d at 515; or facilitate passenger's boarding of the aircraft, *Chutter v. KLM Royal Dutch Airlines,* 132 F.Supp. 611, 613 (S.D.N.Y.1955) (holding, in a pre-*Reed* case, that the service company which provided the plane's entrance ramp was covered by the Warsaw Convention because its services were a part of the "contract of transportation"); *see also Johnson v. Allied Eastern States Maintenance Corp.,* 488 A.2d 1341, 1345 (D.C.1985) (finding that a skycap company was covered by the Warsaw Convention because putting a passenger on a plane was a service performed in furtherance of the contract of carriage).

Convention limits have also been found to apply to air carriers' ground handling agents. *Am. Home Assur. Co. v. Kuehne & Nagel (AG & Co.) KG,* 544 F.Supp.2d 261, 263–266 (S.D.N.Y.2008) (holding that the Montreal Convention's two year statute of limitations barred recovery from ground handling company, since that com-

pany was an agent of the air carrier under Article 30). By contrast, the Convention does not apply to companies performing terminal maintenance services, as these services are "not flight related" and could affect individuals not covered by the Convention. *Alleyn v. Port Authority of New York*, 58 F.Supp.2d 15, 24 (E.D.N.Y.1999).

 Under the undisputed facts, TOGA is an agent of the air carriers it serves and thus covered by the Convention. Although TOGA is a terminal operator, not an international air carrier, its operations are vital parts of Alitalia's carriage—particularly those services that are necessary to get planes to and from the gates. While TOGA provided assistance to several air carriers, all the flights it served were international. *Compare Dazo v. Globe Airport Sec. Servs.*, 295 F.3d 934 (9th Cir.2002) (holding that defendant security company was not an agent of an air carrier when the security checkpoint it operated served three different airlines; "*both domestic and international passengers for all three airlines* had to pass through the security checkpoint, *as did non-passengers* who merely wanted to access the gates or retail establishments beyond the checkpoint;" and "*[t]he services being rendered ... were not in furtherance of the contract of carriage of an international flight*, but were basic airport security services required at all airports by domestic federal law" (emphasis added)). That the services provided to Alitalia were a necessary part of the air carrier's relationship with its passengers is demonstrated by the fact that both TOGA and ASIG were contractually indemnified by Alitalia for their services. Alitalia Lease at TOGA_000060, TOGA_000096; *cf. Alleyn*, 58 F.Supp.2d at 24 (relying, in part, on the fact that air carrier did not indemnify defendant terminal maintenance company in holding that the Convention

did not protect that company). Permitting the plaintiff to recover from the terminal could thus indirectly and impermissibly enable "plaintiffs to recover from the carrier ... damages in excess of the Convention's limits." *Reed*, 555 F.2d at 1089; *see also Waxman*, 13 F.Supp.2d at 514 (arguing that, if contractors were not covered by the Convention, they would demand indemnity agreements, forcing the carrier to ultimately pay more in damages than the Convention provides for).

No reasonable juror could find that TOGA was not an agent of Alitalia for plaintiff's flight from Rome to New York.

## C. Articles 17 and 19 Do Not Permit Claims for Emotional and Dignitary Harm

Since TOGA is an agent of the air carriers, plaintiff can only recover to the extent permitted by the Convention. Plaintiff claims that she is entitled to recover under two provisions: Article 17 and Article 19. She is mistaken.

### 1. Article 17

#### a. Claim Falls Within the Substantive Scope of Article 17

Article 17 provides, in relevant part:

> The carrier is liable for damage sustained in case of death or *bodily injury* of a passenger *upon condition only that the accident which caused the* death or *injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking.*

Montreal Convention art. 17 (emphasis added). The " 'substantive scope' of this article extends to all 'passenger injuries occurring on board the aircraft or in the course of any of the operations of embarking and disembarking'—even if the claim is not actionable under the treaty." *King*, 284 F.3d at 359.

An incident is an "accident" falling under the scope of Article 17 if it is an "unusual event ... external to the passenger" as opposed to the "passenger's own internal reaction to the usual, normal, and expected operation of the aircraft." *Air France v. Saks,* 470 U.S. 392, 405, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985). "This definition should be flexibly applied." *Id.* It broadly encompasses actions committed—or failures to act—by air carriers, fellow passengers, or third parties. *Id.*

Unexpected tarmac delays are treated as "accidents" falling under Article 17. *See Chendrimada v. Air–India,* 802 F.Supp. 1089, 1091–93 (S.D.N.Y.1992) (analyzing action seeking recovery for harms caused by eleven hour tarmac delay under Article 17); *cf. Margrave v. British Airways,* 643 F.Supp. 510 (S.D.N.Y.1986) (analyzing a five hour delay initiated by a bomb threat and prolonged by mechanical failure under Article 17).

Since plaintiffs injuries occurred on board the aircraft as a result of an accident—i.e., the tarmac delay due to heavy snow—her claim falls within the substantive scope of Article 17.

### b. Recovery Limited to Damages Connected to Bodily Injury

Claims for emotional or dignitary injuries are not recoverable under Article 17 unless they are accompanied by bodily injuries. *Tseng,* 525 U.S. at 164, 119 S.Ct. 662 ("[T]he Convention *does not permit recovery for psychic or psychosomatic injury* unaccompanied by bodily injury." (emphasis added)); *Eastern Airlines, Inc. v. Floyd,* 499 U.S. 530, 552, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991) (holding that "an air carrier cannot be held liable under Article 17 when an accident has not caused a passenger to suffer death, physical injury, or physical manifestation of injury"); *Ehrlich,* 360 F.3d at 400 ("[A] carrier may

be held liable under Article 17 for mental injuries only if they are caused by bodily injuries.").

Symptoms experienced must be more severe than mere hunger or thirst to constitute a physical manifestation of injury. In *Chendrimada,* for example, a plaintiff, after being subjected to an eleven hour tarmac delay, "became weak, experienced nausea, suffered severe cramps, pain and anguish and suffered malnutrition as well as mental injury." 802 F.Supp. at 1091. In finding that plaintiff's claim was cognizable under the Convention, the court noted that it "is not ruling that as a matter of law being held on an airplane for over eleven hours without food is a physical injury in and of itself. If a passenger in the same position as plaintiffs had not exhibited any physical manifestation of injury as a result of being held without food, but only alleged emotional injury, no action would lie." *Id.* at 1092. Similarly, in *Jack v. Trans World Airlines, Inc.,* a court held that plaintiffs could only recover for emotional distress either following impact injuries or for physical manifestations resulting from that distress, 854 F.Supp. 654, 668 (N.D.Cal.1994). According to that court, " '[i]mpact injuries' refer to the bodily injuries (such as bruises, lacerations and broken bones) that passengers suffer during an airplane accident.... 'Physical manifestations' refer to those bodily injuries or illnesses (such as skin rashes and heart attacks) that result from the distress one experiences during or after an accident." *Id.* at 664. "Impact injuries also include injuries or illnesses such as heat stroke or severe stomach cramps that occur during a hijacking or extended delay on a plane." *Id.* at 664 n. 8.

### a. Plaintiffs Claim Barred

Since TOGA is agent of international air carriers, plaintiff's claims for

emotional and dignitary harms are preempted by Article 17. Plaintiff suffered no impact injuries or physical manifestations of distress. The sensations she describes in her complaint—hunger, thirst, headache, nausea, and discomfort—are not compensable.

### 2. Article 19

#### a. Claim Falls Within the Substantive Scope of Article 19

Article 19 provides:

> The carrier is liable for *damage occasioned by delay in the carriage by air of passengers, baggage* or cargo. Nevertheless, the carrier shall not be liable for damage occasioned by delay if it proves that it and its servants and agents took all measures that could reasonably be required to avoid the damage or that it was impossible for it or them to take such measures.

Montreal Convention art. 19 (emphasis added). The cause of delay covered by the provision is not defined.

The cases consider "delay" under Article 19 to mean that the air carrier properly delivered baggage or persons to the appropriate destination but it did so in a untimely manner. Unfortunately, the cases do not line up like ducks in a row. District courts have found that Article 19 applies when a passenger does not arrive on time at her promised destination, such as where a passenger's flight is cancelled and she books an alternative flight without affording the airline an opportunity to perform its obligations, *see, e.g., Paradis,* 348 F.Supp.2d at 113–15, or where a passenger was initially refused boarding, but the defendant airline ultimately transported her on a later flight, *see, e.g., Ikekpeazu v. Air France,* No. 04–cv–711, 2004 WL 2810063, at *1 (D.Conn. Dec. 6, 2004). *See also Lathigra v. British Airways PLC,* 41 F.3d 535, 539 (9th Cir.1994) (holding that claims

for failing to arrange or provide substitute transportation "fall within the scope of Article 19"); *Oparaji v. Virgin Atlantic Airways, Ltd.,* 2006 WL 2708034, at *3 (E.D.N.Y.2006) (holding that plaintiff's "claims for damages resulting from his missed flight" after air carrier employees wrongly accused him of using a forged passport were covered by Article 19, not Article 17; "[s]ince Article 17 deals with airline liability for personal injuries, *see Tseng,* 525 U.S. at 169, 119 S.Ct. 662, it does not cover—and therefore does not preempt" that claim).

Most courts agree that Article 19 does not cover actions seeking to recover for contractual non-performance, such as when a passenger who has purchased a ticket is "bumped." *Kg. Wolgel v. Mexicana Airlines,* 821 F.2d 442, 444–45 (7th Cir.1987) (holding, where plaintiffs sought "damages for the bumping itself, rather than incidental damages due to their delay" that the claim was "for total nonperformance of a contract" and "the Warsaw Convention [wa]s inapplicable," but implying that "incidental damages due to [plaintiff's] delay"); *Weiss v. El Al Isr. Airlines, Ltd.,* 433 F.Supp.2d 361, 369 (S.D.N.Y. 2006) (holding that claims derived from "bumping" a passenger "should be read as grounded in a cause of action for nonperformance of contract and not delay. They are, therefore, not preempted by the Montreal Convention"); *cf. King,* 284 F.3d at 361–362 (declining to reach issue of whether bumping claims would fall within substantive scope of Article 19). *But see Fields v. BWIA Int'l Airways Ltd.,* No. 99–CV–2493, 2000 WL 1091129, at *3 (E.D.N.Y. July 7, 2000) ("The case law construing delay under Article 19 generally concerns the practice of 'bumping' passengers."); *Sassouni v. Olympic Airways,* 769 F.Supp. 537, 540–41 (S.D.N.Y.1991) (holding that claim resulting from delay

after plaintiff was denied boarding "due to alleged overbooking of (his) flight" is covered by Article 19 and would be barred under the Convention's statute of limitations).

At least one court has found that tarmac delays, such as those experienced by the plaintiff in the instant case, are covered by Article 19. *Daniel v. Virgin Atlantic Airways Ltd.*, 59 F.Supp.2d 986, 991 (N.D.Cal. 1998) (holding that plaintiff's causes of action for one hour and fifteen minute tarmac delay falls under Article 19 of the Convention).

■ Plaintiff was harmed because she was held on the tarmac beyond the designated time for disembarkation. The contract of carriage was performed, but she was denied timely arrival at her destination. She seeks to recover for the harms caused by this delayed arrival. Plaintiff's economic harms thus fall within the substantive scope of Article 19. *See Daniel*, 59 F.Supp.2d at 991.

### b. Recovery for Emotional Harm Not Permitted

Plaintiff's emotional and dignitary harms are not "damage" recoverable under Article 19.

The Convention does not define what kind of "damage" is covered under this Article. The Supreme Court has indicated that Article 19 covers harms that are distinct from the "personal injuries" recoverable under Article 17. *See Tseng*, 525 U.S. at 168–169, 119 S.Ct. 662 (distinguishing between "the three areas of air carrier liability (personal injuries in Article 17, baggage or goods loss, destruction, or damage in Article 18, and damage occasioned by delay in Article 19)").

Courts in the Second Circuit have found that Article 19 only applies to "*economic* loss occasioned by delay in transporta-

tion." *Sobol v. Continental Airlines*, No. 05–CV–8992, 2006 WL 2742051, at *5 (S.D.N.Y. Sept. 26, 2006) (emphasis added); *Ikekpeazu*, 2004 WL 2810063, at *5 ("Plaintiff's allegations of financial injury resulting from the delay in his return to practice provide a basis for a claim under [Article 19].... However, his allegations of emotional injury do not."); *Thach v. China Airlines, Ltd.*, No. 95 Civ. 8468, 1997 WL 282254, at *4 (S.D.N.Y. May 27, 1997) (holding, where plaintiff was prevented from boarding his flight due to misapprehension that he had a fraudulent passport, that Article 19 only permitted claim for "recovery of the price of his ticket (approximately $1,000);" the Convention barred plaintiff's other claims for unlawful detention, conversion of his passport, conversion of his money, and intentional infliction of emotional distress); *cf. Sassouni*, 769 F.Supp. at 540–41 (not reaching the issue of whether plaintiff could recover for emotional distress under Article 19, as claim would be barred under the Convention's statute of limitations).

■ Emotional harms are not compensable under Article 19. *Daniel*, 59 F.Supp.2d at 992 (holding that it could "not logically find that damages for purely emotional injuries caused by delayed arrival are available under the Convention"); *see also Booker v. BWIA West Indies Airways Ltd.*, No. 06–CV–2146, 2007 WL 1351927, at *4 n. 6 (E.D.N.Y. May 8, 2007); *Ikekpeazu*, 2004 WL 2810063, at *5; *Fields*, 2000 WL 1091129, at *6; *Thach*, 1997 WL 282254, at *4.

Plaintiff argues, citing *Daniel*, that damages for inconvenience are not emotional harms and are separately compensable under the Convention. *See Daniel*, 59 F.Supp.2d at 994 ("[D]amages for inconvenience do not fall within the rubric of 'emotional distress.' Time is money, after all, and the Court finds that the inconven-

ience of being trapped for hours in an unfamiliar airport is a compensable element of damages for delay in air travel under the Warsaw Convention and domestic law, even in the absence of economic loss or physical injury."); *cf. Kupferman v. Pakistan Int'l Airlines,* 108 Misc.2d 485, 438 N.Y.S.2d 189, 192 (N.Y.Civ.Ct.1981) (holding, in a case raising an Article 19 claim for delay of baggage, that "[p]laintiffs are entitled to fair and just compensation for physical discomfort," inconvenience, humiliation, embarrassment and loss of a refreshing, memorable vacation due to the total absence of their luggage including a movie camera for the duration of their trip). Research has revealed few courts that have followed *Daniel's* invitation to compensate for "inconvenience" under Article 19.

■ Mere inconvenience does not support a claim under Article 19. Since plaintiff's only timely claims are for non-economic harms, she cannot recover under Article 19.

### D. No Recovery Under Convention

■ Because TOGA is deemed an agent of air carriers, the Montreal Convention provides the exclusive avenue of recovery, completely preempting her state law claims. Since neither Article 17 (as there is no bodily injury) nor Article 19 (as there is no economic injury) permit compensation for the emotional and dignitary harms alleged in her complaint, plaintiff's Convention-based claims are dismissed.

### VII. New York State Law

Should TOGA not be deemed an agent of Alitalia, then the Convention would not preempt plaintiff's state law claims. Montreal Convention art. 37. But her claims would then fail under applicable New York State law. Recovery for purely emotional harms caused by negligence is not permitted under the circumstances of this case. Her claims for intentional infliction of emotional distress and false imprisonment under New York law are equally without merit.

### A. Negligence

Plaintiff alleges that TOGA breached its duty of care by failing to ensure that it had adequate ground handling staff in order to permit arriving aircraft to access the gates and permit passengers to disembark. *See* PL's Summ. J. Mem. 2. She also claims that "TOGA had a duty to warm airline headquarters to stop launching aircraft to arrive at Terminal One, but failed to do so," foreseeably leading to her imprisonment on the tarmac. *Id.* at 1. While plaintiff claims "severe emotional distress," no physical damages to herself or any third party are alleged. Compl. ¶ 19.

Defendant argues that it did not have a duty to prevent the plaintiff's imprisonment on the tarmac. Def.'s Reply Mem., of L. in Supp. of Mot. to Dismiss Compl. 12, Doc. Entry 25, Feb. 7, 2012. It maintains that its duty to the traveling public is limited to safely maintaining the terminal, implying that the failure to ensure that plaintiff could safely disembark until hours after her arrival was not an unsafe condition which it had an obligation to remedy. *Id.* Because "there is no allegation that TOGA breached a duty to maintain the premises in a safe condition, nor has plaintiff alleged that any breached resulted in an unsafe condition," it submits that it cannot be held liable. *Id.* The defendant also contends that plaintiff has not stated a claim under New York law for the purely emotional harm she suffered because its breach, if any, did not cause her to fear for her safety, nor did it unreasonably endanger her safety. *Id.* at 13.

Contrary to TOGA's contentions, terminals have a duty to ensure that passengers

using their facilities to embark and disembark aircraft can do so in a safe, adequate, and timely manner. This duty is not limited to an obligation to prevent physical harm; it may, in some instances, include a duty to prevent emotional harm. Under the facts of this case, however, plaintiff has failed to provide evidence that her distress was actionable under New York law, so her claim must be dismissed.

### 1. Standard

■ "To establish a prima facie case of negligence, a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Solomon v. City of New York*, 66 N.Y.2d 1026, 499 N.Y.S.2d 392, 489 N.E.2d 1294, 1294 (1985); *see also Japan Airlines Co. v. Port Authority of New York and New Jersey*, 178 F.3d 103, 109 (2d Cir.1999).

■ Summary judgment in a negligence claim is available "[w]here proof of any essential element falls short." *Basso v. Miller*, 40 N.Y.2d 233, 386 N.Y.S.2d 564, 352 N.E.2d 868, 873 (1976). While the issue of due care is almost always a jury question, *Nallan v. Helmsley–Spear, Inc.*, 50 N.Y.2d 507, 429 N.Y.S.2d 606, 407 N.E.2d 451, 458 n. 8 (1980), duty is a question of law for the judge. *Purdy v. Public Adm'r*, 72 N.Y.2d 1, 530 N.Y.S.2d 513, 526 N.E.2d 4, 8 (1988), *rearg. denied*, 72 N.Y.2d 953, 533 N.Y.S.2d 60, 529 N.E.2d 428 (1988) ("The question of whether a member or group of society owes a duty of care to reasonably avoid injury to another is of course a question of law for the courts."). *See also Stagl*, 52 F.3d at 470–71 (analyzing cases). Only in the simplest cases "where only one conclusion may be drawn from the established facts [may] the question of legal cause be decided as a matter of law." *Boltax v. Joy Day Camp*, 67 N.Y.2d 617, 499 N.Y.S.2d 660, 490 N.E.2d 527, 528 (1986).

### 2. Terminal Had a Duty to Plaintiff

In operating its terminal, TOGA has duties similar to those of other terminal operators—namely, common carriers. Among these is the duty to ensure timely ingress and egress of passengers using its facilities.

### a. Duties of Terminals Generally

■ As a general rule, "[w]henever one person is by circumstances placed in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to the circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger." *Havas v. Victory Paper Stock Co.*, 49 N.Y.2d 381, 426 N.Y.S.2d 233, 402 N.E.2d 1136, 1138 (1980). The court's power to modify this rule "is reserved for very limited situations." *Stagl*, 52 F.3d at 469 (analyzing cases). In determining whether a defendant had a duty of care toward the plaintiff, courts look to morality, logic, and the social consequences of imposing the duty. *Eiseman v. State of New York*, 70 N.Y.2d 175, 518 N.Y.S.2d 608, 511 N.E.2d 1128, 1134 (1987).

■ New York law supports the view that the owners and operators of airport terminals have a duty to safely maintain areas under their control. *E.g. Mauriello v. Port Authority of N.Y. & N.J.*, 8 A.D.3d 200, 779 N.Y.S.2d 199, 200–01 (1st Dep't 2004) (denying motion for summary judgment in negligence claim arising out of incident where, "[a]fter picking up his suitcase at the baggage claim area at LaGuardia Airport on a Saturday afternoon, plaintiff tripped over a metal track about 10 inches high that was install-

ed in the floor"); *Stagl,* 52 F.3d at 467–69 (applying New York law and holding that terminal operator had a duty to "safeguard passengers against the foreseeable risks created by its concentration of allegedly unruly travelers around a congested baggage carousel"); *see also Kush v. City of Buffalo,* 59 N.Y.2d 26, 462 N.Y.S.2d 831, 449 N.E.2d 725, 726 (1983) ("A landowner has a duty to exercise reasonable care under the circumstances in maintaining its property in a safe condition."); *Basso,* 386 N.Y.S.2d 564, 352 N.E.2d at 872 ("A landowner must act as a reasonable [person] in maintaining his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk.") (internal quotations omitted); *Koppel v. Hebrew Academy of Five Towns,* 191 A.D.2d 415, 594 N.Y.S.2d 310, 311 (2d Dep't 1993) (same). This duty encompasses the responsibility "to take reasonable precautions to protect [patrons] from dangers which are foreseeable from the arrangement or use of the property." *Stagl,* 52 F.3d at 467 (citing W. Page Keeton, Dan B. Dobbs, Robert E. Keeton, David G. Owen, Prosser and Keeton on Torts, § 61 at 425–26 (5th ed.1984)).

Cases dealing with injuries sustained as the result of a defective condition inside the terminal or on its grounds have found liability. *See, e.g., Di Benedetto v. Pan Am World Serv.,* 359 F.3d 627, 630 (2d Cir.2004) (holding that a terminal operator had a duty under New York law to prevent harm to plaintiff, a Port Authority security officer, who was injured by smoke pouring from a bag containing unlabelled and unreported chemicals that had been placed on a baggage carousel); *Stagl,* 52 F.3d at 467–69 (holding that a terminal operator had a duty under New York law to prevent harm to plaintiff, who was injured when an unidentified fellow passenger pulled his bag

off the baggage carousel, causing another bag to fall on top of her). No decision has been provided in which the harm was caused not by a defective condition on the premises, but by a defendant's failure to ensure that plaintiff could enter those premises in a timely manner.

### b. Duties of Common Carriers

To determine the scope of TOGA's duty, the court looks to the duty required of others who operate similar terminals and stations—notably, common carriers. *See Stagl,* 52 F.3d at 467–68 (analyzing duty owed by air carrier, which operated its own terminal, for harm caused to a passenger in that terminal under common carrier rules). "A common carrier . . . is one who agrees for a specified compensation to transport such property [or persons] from one place to another for all . . . that may see fit to employ him." *Gerhard & Hey v. Cattaraugus Tanning Co.,* 241 N.Y. 413, 150 N.E. 500, 501 (1926). Although carriers were once obligated to exercise a heightened duty of care, they are now "subject to the same duty of care as any other potential tortfeasor—reasonable care under all of the circumstances of the particular case." *Bethel v. N.Y.C Transit Auth.,* 92 N.Y.2d 348, 681 N.Y.S.2d 201, 703 N.E.2d 1214, 1218 (1998)

A common carrier has an obligation "to conserve the safety, convenience and comfort of its passengers." *Garricott v. N.Y. State Rys.,* 223 N.Y. 9, 119 N.E. 94, 95 (1918).

Under [c]ommon law principles, the duty of care owed by a common carrier was not limited to the time in which the passenger was actually on board the carrier, and extended to the time spent by the passenger in the carrier's terminal. Furthermore, 'the duty of a carrier to keep in a safe condition all portions of its platforms and the approaches leading

thereto to which the public is reasonably likely to go is extended to impose a similar duty upon a carrier using the station facilities or approaches of another for its own passengers. So imperative is the duty of a carrier to provide a safe means of access to and exit from its terminal grounds that such duty, it is generally held, cannot be delegated to another....' 7 New York Jurisprudence, Carriers § 333 at 291–92.

*Day v. Trans World Airlines, Inc.,* 393 F.Supp. 217, 223 (S.D.N.Y.1975), *aff'd* 528 F.2d 31 (2d Cir.1975), *cert. denied,* 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976), *reh'g denied,* 429 U.S. 1124, 97 S.Ct. 1162, 51 L.Ed.2d 574 (1977); *see also Kelley v. Manhattan Ry. Co.,* 112 N.Y. 443, 20 N.E. 383, 385 (1889) (holding that common carriers must "exercise ordinary care in view of the dangers to be apprehended" on the maintenance of "the approaches to the cars, such as platforms, halls, stairways, and the like").

### c. Terminal Had a Common Law Duty

■ TOGA had a common law duty to ensure that passengers on arriving flights had safe and prompt access to Terminal One. It provided a necessary link in the chain of transportation, facilitating the common carrier airline's service of its passengers. *See* Part VI, *supra.* Terminal One was designed for the express purpose of permitting passengers to wait for their arriving aircraft and to safely and comfortably board and disembark their flights. TOGA is responsible for all of the facilities and equipment necessary to perform this function, as well as for providing adequate staffing in order to do so.

The defendant's duty to passengers extends beyond merely ensuring that stairs are not slippery, or that gates are properly maintained. It must ensure that those stairs and gates are made available in a timely manner when needed for use by the passengers, and that adequate ground handling staff is present to facilitate access. TOGA should have foreseen that a breach of this duty would cause passengers to remain trapped on their aircraft in cramped and increasingly unpleasant or dangerous conditions. Imposing on defendant this duty is neither novel nor undesirable as a matter of public policy.

■ TOGA knew that it was short-staffed following the snow storm, and that, as a result, it was having difficulty timely clearing empty planes from terminal areas in order to remove snow and to permit arriving planes to disembark. The potential for harm foreseeably increased as more and more international flights continued to arrive at Terminal One. TOGA had a duty to take appropriate firm steps to prevent or delay the arrival of those flights.

■ In general:

[Courts are] cautious ... in extending liability to defendants for their failure to control the conduct of others.... A duty may arise, however, where there is a relationship either between defendant and a third-person tortfeasor that encompasses defendant's actual control of the third person's actions, or between defendant and plaintiff that requires defendant to protect plaintiff from the conduct of others. Examples of these relationships include master and servant, parent and child, and common carriers and their passengers. The key ... is that the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm.

*Hamilton v. Beretta U.S.A. Corp.,* 96 N.Y.2d 222, 727 N.Y.S.2d 7, 750 N.E.2d 1055, 1061 (2001).

In the instant case, defendant was in a favorable position to prevent harm to the plaintiff. TOGA—arguably, unlike the air carrier, Alitalia—was fully aware of the situation on the ground and its inability to handle incoming flights. It should have taken a robust position, ordering Alitalia not to let its flights to JFK take off since no disembarkation facilities were available. Instead, it made a soft, timid suggestion that it might not be able to handle incoming flights adequately, creating no strong sense of the serious dangers in letting planes take off for New York.

If plaintiff's injuries were recoverable under New York law, there would be a triable issue as to whether the defendant terminal: 1) unreasonably failed to provide an adequate method of moving aircraft to and from the gates; or 2) should have taken appropriate, available additional steps to prevent the arrival of additional aircraft at Terminal One once it became aware that those planes would not be able to access a gate in a timely manner.

### 3. Liability for Emotional Distress

Plaintiff claims that she suffered dehydration, headache, nausea, disgust, hunger, thirst, and discomfort. *See, e.g.,* Vumbaca Decl. ¶ 1. Although she has not specifically pled a claim of negligent infliction of emotional distress, no physical injury, either to the plaintiff or any third party, has been shown.

Plaintiff's claim is treated as one for purely emotional distress under New York law. Headache, nausea, hunger, thirst, and discomfort are physical sensations. But unlike the pain accompanying a physical injury, they are not the result of an objectively verifiable disease or impact on the body. Like emotional harms, they are difficult to quantify and easy to fabricate. They are thus generally treated as emotional harms. *See, e.g.,* Restatement (Second) of Torts § 436A cmt. c (1965)

("[E]motional disturbance ... includ[es] temporary fright, nervous shock, nausea, grief, rage, and humiliation. The fact that these are accompanied by transitory, nonrecurring physical phenomena, harmless in themselves, such as dizziness, vomiting, and the like, does not make the actor liable where such phenomena are in themselves inconsequential and do not amount to any substantial bodily harm.").

■ "Every injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit the legal consequences of wrongs to a controllable degree." *Tobin v. Grossman,* 24 N.Y.2d 609, 301 N.Y.S.2d 554, 249 N.E.2d 419, 424 (1969). Claims for emotional harms, such as those alleged by the plaintiff, present three dangers: 1) that causation can be fabricated; 2) that damages can be fabricated; and 3) that the amount of total recovery can be unpredictable. *See Battalla v. New York,* 10 N.Y.2d 237, 219 N.Y.S.2d 34, 176 N.E.2d 729, 731 (1961) (discussing difficulties in evaluating emotional distress claims); *see also, e.g.,* Restatement (Second) of Torts § 436A cmt. b (1965) (same); Restatement (Third) of Torts § 46 cmt. i (Tentative Draft No. 5, 2007) (same).

The law has been changing in favor of recovery, but not yet to the extent required to recognize plaintiff's claims. *See, e.g., id.* § 46 (permitting recovery for emotional harm "when the actor's negligent conduct places the person seeking recovery in danger of bodily harm, but causes only, albeit serious, emotional harm" or "when the negligent conduct occurs within certain classes of activities, undertakings, and relationships in which the conduct does not create a risk of bodily harm but nevertheless poses a significant risk of serious emotional harm"); *Fowler v. Harper, Fleming James, Jr., & Oscar S. Gray, The Law of Torts* § 9.1 (3d ed.2006) ("[I]n

modern negligence law there has been a progressive development of liability for disagreeable emotional disturbance that does not result from bodily injury.... In the absence of a reason for a limitation based on [the general considerations of negligence law], there is an increasing likelihood that serious emotional distress negligently inflicted will be deemed compensable without reference to other bodily harm either antecedent or consequential to that distress."); *see generally* J.D. Lee & Barry A. Lindahl, Modern Tort Law: Liability & Litigation § 32.1, 32.13–30 (2004) (noting changes in coverage for emotional harms and discussing cases); Stuart M. Speiser, Charles E. Krause, & Alfred W. Gans, The American Law of Torts § 16:1 (2009) (discussing the historical treatment of claims for emotional harms and modern cases). Claims for emotional distress are still only permitted when the injury is serious, and the circumstances under which it occurred severe, such that the veracity of the claim cannot be doubted. *See* Restatement (Third) of Torts § 46 cmt. i ("The rule stated in this Section applies only when the person seeking recovery has suffered serious emotional disturbance. In addition, the stimulus must be one that would cause reasonable persons to suffer serious emotional disturbance.").

 In view of the dangers posed by emotional distress claims, New York courts have continued to limit the situations where plaintiffs may recover.

One to whom a duty of care is owed . . . may recover for harm sustained solely as a result of an initial, negligently-caused psychological trauma but with ensuing psychic harm with residual physical manifestations. In the absence of contemporaneous or consequential physical injury, courts have been reluctant to permit recovery for negligently caused psychological trauma, with ensuing emotional harm alone.

*Johnson v. State of New York*, 37 N.Y.2d 378, 372 N.Y.S.2d 638, 334 N.E.2d 590, 592 (1975) (citations omitted). Plaintiffs may also recover for emotional harm suffered as a result of a breach of a duty owed to a third party, but only where that third party is injured and the plaintiff was herself in the "zone of danger." *See, e.g., Bovsun v. Sanperi,* 61 N.Y.2d 219, 473 N.Y.S.2d 357, 461 N.E.2d 843 (1984) (permitting a claim by a bystander in the "zone of danger"). While courts occasionally deviate from this general rule, recovery for emotional harms remains restricted to exceptional cases. *E.g. Lancellotti v. Howard,* 155 A.D.2d 588, 547 N.Y.S.2d 654, 655 (2d Dep't 1989). Shocking circumstances need to be established to permit recovery. Such circumstances have not been shown in this case.

### a. Standard for Emotional Distress Claims

 Where a duty is owed directly to the plaintiff, "[a] breach of th[at] duty of care resulting directly in emotional harm is compensable even though no physical injury occurred when the mental injury is a direct, rather than a consequential, result of the breach and when the claim possesses some guarantee of genuineness." *Ornstein v. N.Y.C. Health & Hosps. Corp.,* 10 N.Y.3d 1, 852 N.Y.S.2d 1, 881 N.E.2d 1187, 1189 (2008) (internal citations and quotations omitted); *see also, e.g., Luna v. American Airlines,* 676 F.Supp.2d 192, 204 (S.D.N.Y.2009) ("[T]o prevail in the absence of proven physical injury, the plaintiff must offer substantial and highly probative evidence of a proximate causal link between the violation of a duty and the psychic injury that she invokes.") (citing *Battalla,* 219 N.Y.S.2d 34, 176 N.E.2d at 731).

In interpreting New York state law, federal courts have added an additional requirement that "[t]he duty ... be specific to the plaintiff, and not some amorphous, free-floating duty to society." *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996). The Court of Appeals for the Second Circuit has held that "[a] generalized duty to prevent unreasonable risks of harm," rather than a "specific, unique duty" owed to the plaintiff, is not sufficient to establish liability for emotional harm unless there is an accompanying physical injury. *Mortise*, 102 F.3d at 697; *Druschke v. Banana Republic, Inc.*, 359 F.Supp.2d 308, 315 (S.D.N.Y.2005) (This duty must be "far more specific than the more generalized duty to avoid negligently injuring another."); *St. John v. Rein Teen Tours, Inc.*, No. 99 Civ. 2537, 2000 WL 977685, at *2 (S.D.N.Y. July 17, 2000) ("[T]he special duty that is required cannot be directed to a class of people but rather must be specific to the particular plaintiff.").

In one particularly striking case, a court held that the plaintiff, a teenage girl who had been locked in a bus overnight, could not recover for the emotional distress she suffered as a result: because the defendants' duty to check the bus and ensure that no one was left behind ran to all the teens who participated on the trip, it did not suffice to establish a claim for negligent infliction of emotional distress because the "duty would not have been owed particularly to her." *St. John*, 2000 WL 977685, at *3; *see also Mortise*, 102 F.3d at 696–97 (2d Cir.1996) (holding that National Guardsmen had only a "generalized duty" to prevent unreasonable risks to citizens passing through a training exercise and affirming grant of summary judgment on negligent infliction of emotional distress claim); *Hazan v. City of New York*, No. 98 Civ. 1716, 1999 WL 493352, at *5 (S.D.N.Y. July 12, 1999) ("Although the City [of New York] has a general duty to prevent its police force from inflicting unreasonable harm on society at large, this duty was not a special one owed specifically to the plaintiff.") (internal citations omitted); *Cucchi v. N.Y.C. Off–Track Betting Corp.*, 818 F.Supp. 647, 656 (S.D.N.Y.1993) ("The termination of an employee does not give rise to a claim for negligent infliction of emotional distress because a corporation owes the same duties to all employees.") (internal citations omitted); *Perrin v. Hilton Int'l, Inc.*, 797 F.Supp. 296, 300 (S.D.N.Y. 1992) (finding that a special duty arose when defendant "undertook to locate [plaintiff's wife] and allegedly supplied erroneous information about her").

This stringent duty requirement is unique to federal cases involving New York state claims for emotional distress. New York state courts generally do not appear to require a specific duty running from the defendant to one plaintiff. *But see Rubinstein v. New York Post Corp.*, 128 Misc.2d 1, 488 N.Y.S.2d 331, 334 (N.Y.Cnty.Sup.Ct.1985) ("While the law has recognized the right of recovery for the negligent infliction of emotional injury under unique circumstances, as in *Battalla v. State of New York*, 10 N.Y.2d 237, 219 N.Y.S.2d 34, 176 N.E.2d 729 (where an infant was permitted to sue for alleged emotional and neurological disturbance as a result of negligence in operating a chair lift at a ski slope), and *Ferrara v. Galluchio*, 5 N.Y.2d 16, 176 N.Y.S.2d 996, 152 N.E.2d 249 (1958) (mental anguish inflicted by false report of cancer), such recovery is circumscribed to unique facts where a special duty is owed."). In *Johnson v. State of New York*, for example the New York Court of Appeals held, in a case involving a false death notification sent to plaintiffs, that the "[k]ey to liability is the hospital's duty ... to advise the proper next of kin of the death of a patient." 37 N.Y.2d 378,

372 N.Y.S.2d 638, 334 N.E.2d 590, 591 (1975). This duty was arguably neither specific nor unique to the particular plaintiff in the case; any hospital would have a similar duty to the next of kin of all of their patients. In *Lando v. New York,* the New York Court of Appeals held that a father could recover for the emotional distress he suffered following his "mentally deficient" daughter's death at a hospital. 39 N.Y.2d 803, 385 N.Y.S.2d 759, 351 N.E.2d 426, 426 (1976). In so holding, the court did not dwell on the daughter's "unique" limited capacity, but on the fact that the harm was suffered "solely by reason of the hospital's negligence" in conducting its search for her once it discovered that she was missing. *Id. Contra St. John,* 2000 WL 977685, at *3 (stating that the court in *Lando* "did not assume that the hospital owed a duty to all its patients to prevent them from wandering off in the first place" and implying that the duty arose because of the patient's limited mental capabilities). Similarly, in *Broadnax v. Gonzalez,* the New York Court of Appeals permitted a patient to recover from her obstetrician for negligent infliction of emotional distress claim where malpractice resulted in miscarriage. 2 N.Y.3d 148, 777 N.Y.S.2d 416, 809 N.E.2d 645, 648–49 (2004). In so holding, the court did not focus on specific characteristics of the mother that created a unique duty; rather, it appears that any obstetrician would owe such a duty to all of his patients.

 The duty of a federal court sitting in diversity is to apply New York state law as defined and interpreted by New York state courts. The more restrictive federal cases do not govern. Because there is no indication that New York state courts require the defendant to have a special, unique duty to the plaintiff, she need not established that such a specific duty was owed in the instant case. The more generous rulings of New York state courts apply in defining New York's common law.

### b. Insufficient Guarantees of Genuineness

 Plaintiffs may show that their injuries are a direct result of defendant's breach and that the injuries have the requisite "guarantees of genuineness" in one of two ways:

> [A]n individual can recover for the psychic injuries suffered as a result of another's negligence where there has been no physical impact if the party seeking recovery was subjected to the fear of physical injury as a direct result of the tortious conduct.... Further, .... there may be recovery for the emotional harm, even in the absence of fear of potential physical injury, to one subjected directly to the negligence of another as long as the psychic injury was genuine, substantial, and proximately caused by the defendant's conduct.

*Howard v. Lecher,* 42 N.Y.2d 109, 397 N.Y.S.2d 363, 366 N.E.2d 64, 65 (1977) (citation omitted);

 In the absence of fear of injury, the requisite guarantees of genuineness can be provided by the shocking or severe nature of the claim itself. *See, e.g. Baker v. Dorfman,* 239 F.3d 415, 421 (2d Cir. 2000) (finding that, under New York law, special circumstances may provide the requisite "guarantee of genuineness" due to the "causation and substantiality of the harm suffered") (citing *Johnson,* 372 N.Y.S.2d 638, 334 N.E.2d at 593). Special circumstances exist where the claim involves the death of a family member, *e.g. Lando,* 385 N.Y.S.2d 759, 351 N.E.2d at 426–27 (permitting claim for emotional distress where father was "denied access to and control over the body of his deceased daughter for a period of 11 days"); *John-*

*son*, 372 N.Y.S.2d 638, 334 N.E.2d at 592–92 (permitting recovery from hospital for emotional distress caused by false information that plaintiff's mother had died); *Augeri v. Roman Catholic Diocese of Brooklyn*, 225 A.D.2d 1105, 639 N.Y.S.2d 640 (4th Dep't 1996) (holding that a complaint alleging negligence of cemetery that interfered with proper disposal of family member's remains stated a cause of action for negligent infliction of emotional distress); *Lauer v. City of New York*, 171 Misc.2d 832, 656 N.Y.S.2d 93 (Queens Cnty. Sup.Ct.1997) (permitting recovery for emotional harm from medical examiner's failure to reveal the results of an autopsy concerning the death of a relative); or diagnosis of a life-threatening disease, *Baker*, 239 F.3d at 421–22 (holding that a cause of action lies for negligent infliction of emotional distress in the case of a negligent false positive result on an HIV test, as "the anguish of the positive test result is a ... direct and predictable emotional impact than the anxiety of having insufficient information"); *Ornstein v. New York City Health and Hospitals Corp.*, 10 N.Y.3d 1, 852 N.Y.S.2d 1, 881 N.E.2d 1187, 1189 (2008) (same); *Trapp v. Metz*, 28 N.Y.2d 913, 323 N.Y.S.2d 166, 271 N.E.2d 697 (1971) (holding that a plaintiff may recover for heightened anxiety he suffered because a cancerous growth was not timely discovered and removed). *Cf. Martinez v. Long Island Jewish Hillside Medical Ctr.*, 70 N.Y.2d 697, 518 N.Y.S.2d 955, 512 N.E.2d 538, 539 (1987) (holding that plaintiff had a cause of action for emotional distress where she believed that abortion was a sin, yet had an abortion after defendants negligently and erroneously advised her that her baby would be born with birth defects). Recovery has been denied for emotional harm resulting from diagnosis that falls short of life-threatening disease. *Lancellotti*, 547 N.Y.S.2d at 655 (holding that plaintiff could not recover for purely psychic harm resulting from misdiagnosis of pregnancy and subsequent treatment for seven months).

■ In the absence of such special circumstances, "[p]sychiatric testimony may suffice for such a 'guarantee of genuineness', but a plaintiff's uncorroborated testimony of upsetness will not." *Luna*, 676 F.Supp.2d at 205 (holding that plaintiff's claim of emotional distress after she ate a foreign object in an airline meal survived summary judgment, where plaintiff's emotional injury was corroborated by testimony of a doctor who observed signs of anxiety two days after the incident and instructed plaintiff to use a tranquilizer for it); *see also Perry–Rogers v. Obasaju*, 282 A.D.2d 231, 723 N.Y.S.2d 28, 29–30 (1st Dep't 2001) (permitting recovery for emotional harm where "it was foreseeable that the information that defendants had mistakenly implanted plaintiffs' embryos in a person whom they would not identify, which information was not conveyed until after such person had become pregnant, would cause plaintiffs emotional distress over the possibility that the child that they wanted so desperately, ... might be born to someone else and that they might never know his or her fate" and "plaintiffs' medical affidavits attest[ed] to objective manifestations of their emotional trauma"). *Cf. Garcia v. Lawrence Hosp.*, 5 A.D.3d 227, 773 N.Y.S.2d 59, 60 (1st Dep't 2004) (holding that evidence of "medical treatment or psychological counseling" is not necessary where special circumstances "by themselves, provide the necessary index of reliability").

Plaintiff points to cases in which New York courts have awarded a refund of plaintiffs' travel expenses to compensate for physical discomfort, inconvenience, or mental anguish suffered. *See, e.g., Kupferman*, 438 N.Y.S.2d at 192–93 ("Plaintiffs

are entitled to fair and just compensation for physical discomfort, inconvenience, humiliation, embarrassment and loss of a refreshing, memorable vacation due to the total absence of their luggage including a movie camera for the duration of the China Tour."); *see also Odysseys Unlimited Inc. v. Astral Travel Service*, 77 Misc.2d 502, 354 N.Y.S.2d 88 (Nassau Cnty. Sup.Ct.1974) (awarding damages for mental anguish, inconvenience, and humiliation that resulted from inadequate accommodations). In these cases, while the damage award compensated for emotional distress, the amount of expenses provides a clear and objective upper limit on damages, avoiding one of the many issues associated with compensating for these intangible harms.

 While New York law on the point is not crystal clear and is developing, even under a generous view of present case law, plaintiff has failed to adduce sufficient evidence to support her claim for negligent infliction of emotional distress. It is undisputed that the situation aboard the stranded aircraft was uncomfortable. She was forced to endure seven overnight hours in tight quarters, accompanied by dehydration, headache, nausea, disgust, hunger, thirst, and discomfort. *See, e.g.,* Vumbaca Decl. ¶ 1. But she was never in danger of physical injury, nor could she have reasonably feared such harm to her person. The circumstances endured by the plaintiff is substantially less traumatic than other instances in which New York courts have found sufficient "guarantees of genuineness." Her claim fails as a matter of law.

### B. Intentional Infliction of Emotional Distress

 Intentional infliction of emotional distress is actionable in New York only for extremely egregious conduct.

*Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86, 90 (1983). Under New York law, a claim for intentional infliction of emotional distress requires a showing of "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. New York Post Co.*, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699, 702 (1993); *see also Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999); *Moore v. City of New York*, 219 F.Supp.2d 335, 338–9 (E.D.N.Y.2002).

 In order to state a valid intentional infliction of emotional distress claim, a plaintiff must meet a "rigorous, and difficult to satisfy" standard. *Howell*, 596 N.Y.S.2d 350, 612 N.E.2d at 702; *see also Conboy v. AT & T Corp.*, 241 F.3d 242, 258 (2d Cir.2001). To be considered extreme and outrageous, "conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Howell*, 596 N.Y.S.2d 350, 612 N.E.2d at 702 (internal citations and quotations omitted). Whether conduct is sufficiently outrageous is decided a matter of law. *Id.; see also Baez v. JetBlue Airways*, 745 F.Supp.2d 214, 223 (E.D.N.Y. 2010).

No ruling New York case has been cited supporting a holding that defendant's conduct was sufficiently outrageous to support a finding of intentional infliction of emotional distress claim. *Howell*, 596 N.Y.S.2d 350, 612 N.E.2d at 702 ("[O]f the intentional infliction of emotional distress claims considered by this Court, every one has failed because the alleged conduct was not sufficiently outrageous."); *Elmowitz v. Executive Towers at Lido, LLC*, 571

F.Supp.2d 370, 378 (E.D.N.Y.2008) (same); *see also, e.g., Marmelstein v. Kehillat New Hempstead,* 11 N.Y.3d 15, 862 N.Y.S.2d 311, 892 N.E.2d 375, 376 (2008) (finding that the outrageousness standard was not met by complainants' allegations that rabbi abused his position of authority by beginning a sexual relationship and subsequently attempting to prevent the victim from disclosing it by threatening to place her in a strait jacket, ban her from the synagogue, and turn the community against her).

Lower courts in New York have sustained some claims for intentional infliction of emotional distress, but all of these cases included intentional acts "involv[ing] some combination of public humiliation, false accusations of criminal or heinous conduct, verbal abuse or harassment, physical threats, permanent loss of employment, or conduct contrary to public policy." *Stuto,* 164 F.3d at 820 (analyzing New York cases).

Courts in other jurisdictions, applying a similar standard, have found that tarmac delays are not sufficiently unreasonable to constitute intentional infliction of emotional distress. *See Ray v. American Airlines, Inc.,* 609 F.3d 917 (8th Cir.2010) (affirming grant of summary judgment; a nine hour tarmac delay was not sufficiently outrageous to support an intentional infliction of emotional distress claim); *Abourezk v. New York Airline, Inc.,* 705 F.Supp. 656, 665 (D.D.C.1989) (finding a three hour tarmac delay preceding a one hour flight not sufficiently outrageous to constitute intentional infliction of emotional distress).

▆ Plaintiff alleges that the defendant intentionally or recklessly failed to fulfill its contractual obligations and general duties as terminal operator or to comply the snow plan. Even if plaintiff's allegations are true, as a matter of law, defendant's behavior falls short of the requisite egregiousness.

Plaintiff insists that the existence of outrageousness can be extrapolated from federal regulations, promulgated *after* the events in question, requiring foreign carriers "not permit an international flight to remain on the tarmac at a U.S. airport for more than four hours without allowing passengers to deplane subject to safety, security, and ATC exceptions." Enhancing Airline Passenger Protections, 76 Fed.Reg. 23110, 23110 (Apr. 25, 2011). This argument is unpersuasive. Regulators specifically declined to extend these regulations to airports or terminals such as TOGA. *Id.* at 23113 ("After fully considering the comments received, the Department has decided not to promulgate a requirement that airports adopt contingency plans addressing lengthy tarmac delays."). Nor is the existence of a regulation designed to eliminate lengthy tarmac dispositive of whether those delays are sufficiently outrageous.

The claim of intentional infliction of emotional distress is dismissed.

### C. False Imprisonment

▆ To establish a cause of action for false imprisonment under New York law, a plaintiff must show that: "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Broughton v. State,* 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310, 314 (1975), *cert. denied sub nom Schanbarger v. Kellogg,* 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975); *see also Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) ("Under New York law, a plaintiff claiming false arrest must show, inter alia, that the defendant intentionally confined him without his consent and without justification."). When a legal duty exists to release plaintiff from confinement, an

intentional refusal to release plaintiff constitutes false imprisonment. *E.g. Talcott v. National Exhibition Co.*, 144 A.D. 337, 128 N.Y.S. 1059 (2d Dep't 1911) (holding that, while staff of the defendant baseball park could prevent plaintiff visitor from exiting through the main exit, which was impassable due to a large crowd, it had a duty to inform him of another exit rather than detain him inside the stadium).

▇▇▇ Under New York law, "mere knowledge and appreciation of a risk is not the same as the intent to cause injury. . . . A result is intended if the act is done with the purpose of accomplishing such a result or with knowledge that to a substantial certainty such a result will ensue. . . ." *Finch v. Swingly*, 42 A.D.2d 1035, 348 N.Y.S.2d 266, 266 (4th Dep't 1973); *see also, e.g., McGroarty v. Great Am. Ins. Co.*, 43 A.D.2d 368, 351 N.Y.S.2d 428, 434 (2d Dep't 1974) (defining the word "intent" as meaning that "the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it") (quoting Restatement (Second) of Torts § 8A (1965)). A defendant acting with intent must be more than merely negligent or reckless: "An act which is not done with [intent] does not make the actor liable to the other for a merely transitory or otherwise harmless confinement, although the act involves an unreasonable risk of imposing it and therefore would be negligent or reckless if the risk threatened bodily harm." Restatement (Second) of Torts § 35(2) (1965). The Restatement illustrates the point as follows: "A, knowing that B, a customer, is in his shop, locks its only door in order to prevent a third person from entering. This is [an intentional] confinement of B, and A is subject to liability to him unless, under the circumstances, he is privileged." *Id.* cmt. d. Although A did not have the purpose of confining B—his purpose was to prevent a third person from entering—he was certain that his action would lead to the imprisonment of B.

Courts in other circuits, analyzing analogous circumstances under substantially similar common law rules, have dismissed claims for false imprisonment where plaintiffs were forced to remain inside a grounded aircraft for several hours. *See Ray*, 609 F.3d at 924–925 (affirming grant of summary judgment on claims for false imprisonment and negligence arising from a nine hour tarmac delay); *Abourezk*, 705 F.Supp. at 663–64 (holding that an airline passenger was not falsely imprisoned when he was not allowed off an airplane which was waiting in line to take off for New York City due to bad weather, since the passenger had voluntarily entered the plane and given the pilot express consent to fly to New York), *aff'd* 895 F.2d 1456 (D.C.Cir.1990) (per curiam); *cf. Sousanis v. Nw. Airlines, Inc.*, No. C–99–2994, 2000 WL 34015861, at *5–6 (N.D.Cal. Mar. 3, 2000) (dismissing false imprisonment claim of airline passenger who was forced to remain in her seat while her flight remained parked at the gate or on the runway due to weather-related and mechanical problems for approximately six hours).

In *Abourezk*, plaintiff booked a flight to New York in order to attend an event that same evening. 705 F.Supp. at 657. When weather caused a three-hour delay that prevented him from actually reaching the event on time, he asked to deplane. *Id.* at 657–58. The pilot refused, and flew on to New York. *Id.* at 658. The district court found that the plaintiff had consented to his initial confinement aboard the aircraft and thus framed the inquiry as whether he had "the right to revoke consent to a voluntary short term confinement." *Id.* at 664. It held that there could be no claim for false imprisonment, since there was no common law duty to release the plaintiff in

the absence of exigent circumstances, "[n]or d[id] the facts indicate that [he] had the right to arrive in New York City at a specific time." *Id.* The court found dispositive the fact that "the airline's actions neither created nor lengthened the delay." *Id.* at 664. The D.C. Circuit affirmed. 895 F.2d at 1458.

Similarly, in *Ray,* plaintiff's flight was held on a tarmac for nine hours due to bad weather conditions at its final destination. 609 F.3d at 920–21. Despite being offered two opportunities to deplane, plaintiff chose to remain on the aircraft in the hopes that it would eventually take her to her final destination. *Id.* The Court of Appeals for the Eighth Circuit held, on a motion for summary judgment, that defendants were entitled to judgment as a matter of law on plaintiff's false imprisonment claim because she "could not prove that her detention on the plane was without consent and without authority of law." *Id.* at 924. Because the plaintiff failed to present evidence of "any statute or regulation, federal or state, in existence on [the day of her confinement in the aircraft] that placed a limit on the number of hours [the air carrier] was permitted to keep passengers aboard one of its airplanes during a delay or that otherwise controlled the conduct [she] alleges forms the basis of her false imprisonment claim." *Id.*

In the instant case, plaintiff initially consented to her confinement in the aircraft for the purposes of her transportation from Rome to New York. Her consent was limited to that purpose; she did not consent to be detained indefinitely aboard the aircraft. As described in Part VI(A)(1), defendant had a duty to provide a safe means of egress from the airplane; it is assumed, for the purposes of this motion, that its failure to ensure that there were adequate ground handling staff was the proximate cause of her confinement. The question remains, however, whether defendant's failure to provide a means of egress was intentional.

■ In general, courts are reluctant to decide issues of intent on a motion for summary judgment. *See Johnson v. Ganim,* 342 F.3d 105, 117 (2d Cir.2003) (holding, in a case involving a constitutional tort, that "[w]here a factual issue exists on the issue of motive or intent, a defendant's motion for summary judgment on the basis of qualified immunity must fail"); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Turtur,* 892 F.2d 199, 205 (2d Cir.1989) ("Questions of intent, we note, are usually inappropriate for disposition on summary judgment."); *Orange Lake Assocs., Inc. v. Kirkpatrick,* 825 F.Supp. 1169, 1177 (S.D.N.Y.1993) ("Cases in which the underlying issue is one of motivation, intent, or some other subjective fact are particularly inappropriate for summary judgment, as are those in which the issues turn on the credibility of the affiants."), *aff'd,* 21 F.3d 1214 (2d Cir.1994); *Sorensen v. City of New York,* No. 98 Civ. 3356, 2003 WL 169775, at *4 (S.D.N.Y. Jan. 23, 2003) ("It is well-settled that questions of intent in a variety of contexts cannot be resolved on a motion for summary judgment.").

■ In this case, plaintiff has failed to create a genuine issue of material fact as to the defendant's intent to confine her. Nothing in the record demonstrates that the defendant was more than merely negligent in its handling of the events of late December 2010. While it was likely that passengers would be confined in the aircraft for some period of time after landing, this possibility fell far short of the high probability that is required for defendant's knowledge to rise to the level of intent. No reasonable juror could conclude otherwise.

The claim for false imprisonment is dismissed.

#### D. No Recovery Under New York Law

Construing all disputed facts in her favor, plaintiff's claims fail as a matter of New York state law.

### VIII. Conclusion

Plaintiff suffered psychic harm from her overnight confinement on a plane stranded on the snowbound tarmac of JFK. A reasonable jury could find that her suffering was caused by TOGA's negligent breach of a duty to her.

Nevertheless, her claims are not recognized by New York law. Nor are they permitted by the Montreal Convention. The gravamen of the case is for feelings of distress for which recovery does not lie. The case is dismissed.

No costs or disbursements are awarded.

SO ORDERED